## MEDICAL MALPRACTICE REVIEW PANEL

Evelyn G. Benedict

v.

Community Hospital
of Roanoke Valley

February 29, 1988

By JUDGE JACK B. COULTER

The discoverability of incident reports, by whatever name called, or their functional equivalents, is the issue of the moment in these proceedings. Evelyn G. Benedict was a patient in the Community Hospital of Roanoke Valley from October to December, 1983, having undergone amputation of the left leg below the knee. While recuperating, she claims that she sustained additional injuries to the stump of her leg, apparently as a result of three separate events: a blow to the stump of her leg during physical therapy on November 22, 1983; falling on her stump on November 27, 1983, while trying to move unattended from her chair to her walker; and again striking her abbreviated leg on December 4, 1983, when she was dropped by a nursing assistant. The claimant seeks to hold the hospital responsible for these acts or omissions of alleged negligence, contending that as a result her healing was delayed, additional pain, suffering, and depression experienced, and further medical expenses incurred.

On June 7, 1984, Ms. Benedict's attorney requested access to all medical records relating to her hospitalization and treatment. Fifteen months later on October 10, 1985, formal notice of a malpractice claim was given. The hospital thereupon on December 4, 1985, requested that the claim be referred to a medical review panel. After some discovery efforts, an informal hearing on the defendant's objections to the claimant's Interrogatory

No. 7 was held on August 25, 1986, at which time the incident reports prepared by the hospital were held to be discoverable. This decision was in keeping with several similar rulings that the court had recently made. No order memorializing this decision, however, was ever submitted.

Thereafter, the defendant disclosed that though an incident report, which it identified as a Quality Care Control Report, and a "writing" by Charlotte Oliver had been prepared contemporaneously with the incident or incidents, they were now missing and hence could not be produced for discovery purposes. Though counsel for the defendant did not know that the documents were missing at the time he urged their immunity from discovery, and no one is suggesting otherwise, the claimant raises the nasty specter that they could have been conveniently misplaced by hospital personnel after resistance to its production had proved unavailing -- a very uncomfortable and unpleasant suspicion, the validity of which will probably never be known. In any event, the defendant in its amended answer to Interrogatory No. 7 and subsequent memorandum has identified eight documents which it concedes could possibly be construed as responsive to the claimant's interrogatory.

*The Interrogatory and the Amended Answer*

Interrogatory No. 7 read as follows:

(7) Was any Incident Report or similar document prepared following any of the injuries Mrs. Benedict received involving her stump? If so, please describe it and advise who has custody of it now.

The defendant's amended answer and subsequent memorandum have disclosed:
1. Risk Management Review Report (prepared after claimant's attorney's request to review the medical records on June 7, 1984).
2. Routine Questions on Claims Concerning Falls (prepared by Head Nurse Belinda Williams after claimant's attorney's request to review the medical records).

3. and 4. Statements of Sharon Saferight, R.N. and J. Harper, R.N. (prepared following a visit from a member of the claimant's family to the hospital on February 1, 1984, seeking information about the injuries).

5. Statement of Nurse Williams (prepared at the request of the hospital's in-house attorney on May 6, 1984).

6. Supplemental statement of Nurse Williams (prepared at the request of the insurance carrier for use by its attorney after the claimant's attorney's request to review the claimant's medical records).

7. Statement of Charlotte Oliver, Nursing Assistant (prepared at the request of the insurance carrier on October 18, 1985, after the claimant had filed her formal notice of her claim against the hospital).

8. Transcript of insurance carrier's interview with Diane Osborne, Director of Physical Therapy (transcribed on February 11, 1986, for the use of the attorney for the insurance carrier).

## The Defendant's Contention

The defendant contends that none of these eight documents should be discoverable on the following grounds:

1. That these reports, statements, or transcripts are privileged within the scope of § 8.01-581.17 of the Code of Virginia of 1950, as amended.

2. That these documents were prepared in anticipation of litigation and hence are entitled to the protection of Rule 4:1(b)(3) of the Rules of the Supreme Court of Virginia.

3. That these documents were also prepared at the request and for the review of an attorney and are accordingly likewise entitled to the protection of the same Rule 4:1(b)(3).

## The Precedents of This Court: Malone and Johnson

These points and arguments in their support have heretofore been thoroughly and painstakingly considered by this court after the submission of excellent briefs and persuasive arguments involving extensive research in two other recent cases: *Malone, Exec. v. Gill Memorial,*

City of Roanoke Circuit Court Law action 86-0307, and *Johnson, Admx. v. Roanoke Memorial Hospitals, Inc.,* City of Roanoke Circuit Court Law Action 87-321.

In *Malone,* an operation on the plaintiff's decedent, Stella Reamey, for cataracts and a lens implant was begun but aborted because of the patient's restlessness under anesthesia. She was sent to the recovery unit and shortly thereafter to her room. Early the next morning, Ms. Reamey could not be aroused and became comatose. She died four months later, having never regained consciousness. The incident report, recorded statements taken by the insurance adjuster, and various manuals were held discoverable over vigorous objections of the defendant. There was no formal written opinion rendered in that case, but a lengthy oral ruling was delivered from the bench, transcribed, and made a part of the record.

In *Johnson,* the plaintiff's decedent died at age 33 on his way home after being treated for a sore throat and released from the emergency room of the Roanoke Memorial Hospital. There were no incident reports available, but the plaintiff sought certain formal Job Descriptions for Nurses Aides and Registered Nurses and the Care Manual on Triage and Nursing Assessment. The court held that these documents were discoverable, again over the strong arguments of the defendant that they were privileged under the same statute relied on in this case (§ 8.01-581.17). The 13-page written opinion, in which ten decisions from other jurisdictions upholding the discovery of similar material were cited, noted at the outset:

> Because of the importance of the issue, the tenacity of the defendant's resistance, public policy concerns in genuine conflict, and the apparent differing attitudes and rulings of state trial judges, a review of this court's analysis and prior conclusion is justified. The matter thus will be considered afresh and subjected to more reasoned review.

*Concern for Consistency, Though a Factor, Does Not
Create Disability for Self-Correction*

Consistency from the bench is an essential ingredient of justice; it is a necessary component of a stable jurisprudence. Upon it rests the doctrine of stare decisis. Precedent would be meaningless without it. Continuity of the law and respect for past decisions satisfy the need for some certainty and understanding of what the law is. Treating litigants equally under similar factual situations is simply a trademark of Anglo-American law. And yet, as Emerson has so poignantly put it:

> Consistency[2] is the hobgoblin of little minds, adored by petty statesmen, philosophers, and divines.

and:

> With consistency a great soul has simply nothing to do. He may as well concern himself with his shadow on the wall.

Concern for consistency, therefore, though a significant factor, should never inhibit the reexamination of complex issues; it should not imprison reason nor create disability for self-correction. The problem, therefore, will again be reviewed anew particularly since the thrusts of this defendant's arguments are somewhat different than those advanced in *Malone* and *Johnson*.

*The Defendant's Arguments Analyzed.
Oxymoronia Is Not the Key. What Is the
"Ordinary Course of Patient Treatment"
Is the Ultimate Question*

In *Malone* and *Johnson* the documents sought to be discovered, other than the incident report, were for the most part materials developed *after* the meetings of peer review committees. In the case at bar, it is

---

[2] It is, of course, a FOOLISH consistency that Emerson condemns.

suggested that the reports at issue would have preceded such meetings. Hence the defendant places great emphasis on the provision in § 8.01-581.17 which grants privilege to "*all* communications, both oral and written, originating in or *provided* to such committees." Since such reports were, in fact, provided to a committee or committees that come within the protective umbrella of the statute, ergo by inescapable logic they are privileged. And so it would seem to be except for the last provision of this statute which, as in *Malone* and *Johnson*, must be reckoned with.

> Nothing in this section shall be construed as providing any privilege to hospital medical records kept with respect to any patient *in the ordinary course of business of operating a hospital* nor to *any* facts or information contained in such records nor shall this section preclude or affect discovery of or production of evidence relating to hospitalization or treatment of any patient in *the ordinary course of hospitalization of such patients.*

Unlike the arguments presented in *Malone* and *Johnson*, the defendant at bar urges most earnestly and vigorously that the records or evidence sought were not kept in the ordinary course of the business of operating a hospital nor did they relate to the hospitalization or treatment of a patient. The defendant argues, in other words, that before the exclusion of the last provision of the statute can apply the records or evidence sought must have been medical records kept in the ordinary course of the business of operating a hospital, or they must relate to the ordinary course of hospitalization or treatment of the patient. The defendant's argument continues that incident or risk management review reports, routine questions concerning falls, and interviews with nurses who may know something about a patient's fall are not medical records and are not kept in the ordinary course of the business of operating a hospital nor do they include facts or evidence relating to the hospitalization or treatment of a patient in the ordinary course of the hospitalization of a patient. Therefore, the defendant contends, such records should not

be granted the immunity from privilege which was intended by the last sentence of this statute.

This argument, however, begs the question. What are, or should be, records kept in the ordinary course of treating a patient or operating a hospital with respect to patients, that is the ultimate question. The ordinary course of a hospital's function surely includes the prevention of accidents or mishaps to those who have been entrusted to its care. Charting the ordinary course of a patient's treatment would or should require description of events out of the ordinary that relate to a patient's health and well-being. As a health care provider, protection from further illness or injury is an inescapable component of treating a patient.

To suggest that negligent acts or omissions are not a part of a patient's usual treatment and that, therefore, they should not be considered as part and parcel of delivering health care may be oxymoronic, as erudite counsel suggests, but such characterization does not thereby make the argument valid. It is false reasoning as the following analysis should demonstrate. The defendant advances this proposition: *Premise*: An accident is not part of a patient's usual treatment. *Conclusion*: Therefore any record concerning an accident, it not being usual or in the ordinary course of patient treatment, is privileged.

The premise may indeed be oxymoronic, i.e. self-contradictory. Causing additional injury by accident is certainly contradictory to the notion of usual treatment. But the fallacy in this argument exists in the definition of terms; confusion is created in stating the premise. It is not claimed, nor could it be reasonably suggested, that causing an accident is part of a patient's usual treatment; the contention is that the prevention of accident is, or should be, part of his usual treatment.

Thus the smoke screen of oxymoronia beclouds the issue. The only oxymoronic element in this controversy is the statute itself (oxymoronic meaning a self-contradictory expression such as "cruel kindness"; but being oxymoronic does not settle an argument: which thought prevails "cruelty" or "kindness"?)

What could be more within the ordinary course of the treatment of a patient who has lost her leg than

careful supervision that she not fall on her stump, that she not be left negligently unattended, that she be helped with due care when she shifts from chair to bed or from bed to walker, that her physical therapy be conducted with proper attention. Because a hospital may not choose to call a document a "medical record" or may contend that various reports are not maintained in the ordinary course of a hospital's business or a patient's treatment does not make it so. The ordinary course of a hospital's business or a patient's treatment is the welfare and safety of its patients. And *any* document that relates to that all-embracing concept comes, or should come, within the meaning of the last sentence of the statute in question, oxymoronic as it makes the entire section, except, as this court has indicated in its *Johnson* opinion, the precise proceedings and minutes of the true peer review committees where the free exchange of criticisms should not be hindered.

The argument that all the field work, the incident reports, the questions concerning falls that might preceded a peer review meeting, should be free from discovery (which admittedly is granted by the statutory language that "all communications. . . provided to such committees" are privileged) must yield to the more compelling mandate of the statute's last sentence. Otherwise, all documents could become privileged simply by the committee requiring their production, or attaching them to the minutes. As stated in *Johnson*: "Almost anything could come within such broad and limitless sweep."

*"Anticipation of Litigation" Must Be the Predominant Reason of Creating a Document; "Need" for Discovery is a Relative Concept*

If not privileged, then, within the meaning of the contradictory provisions of the statute in question, the defendant urges that nonetheless they should not be discoverable since they were prepared in anticipation of litigation and are protected by the provisions of Rule 4:1(b)(3) of the Rules of the Supreme Court. Here, again, a litigant can always claim that documents sought were made in "anticipation of litigation." In reality, when an untoward event has occurred to a patient in a hospital causing injury, hospital officials, keenly con-

scious of the litigious nature of the American character, will undertake an investigation to accumulate *facts* so as to be fully informed if claim is ultimately made. But such information is also sought in pursuit of the hospital's noble objectives of remedying procedures or policies that bring about accidents. The investigation is part of the hospital's program of quality control.

The injured patient, on the other hand, is at such an unfair advantage: one single individual, sick and weakly, pitted against a colossal corporate giant with staff and resources unlimited and personnel schooled in the techniques of avoiding or minimizing losses for claimed negligence. Already incapacitated and perhaps further damaged by the incident and at the complete mercy of the personnel from whom she seeks recovery and relief, she is hardly in position to undertake critical investigation of what happened. It is, after all, the search for truth that is the engagement at hand and if, as defendant's counsel volunteers, "The hospital's position is not motivated by a desire to hide the substantive contents of the reports. . ." then, especially since the incident reports are no longer available, their functional equivalents should be produced. It is, of course, the *factual* presentation of what happened that is discoverable; mental impressions, conclusions, or opinions are not included. All factual statements and reports, therefore, that were obtained prior to the claimant's attorney's entrance on the scene (June 7, 1984), which include Documents No. 3, 4, and 5, should be discoverable, as the defendant has not sustained its burden of showing that they were *predominantly* made in anticipation of litigation.

As to Document No. 1 (the Risk Management Review Report) and Document No. 2 (Routine Questions of Claims Concerning Falls) prepared apparently after June 7, 1984, when the claimant's attorney made his first request (although the claimant's attorney in her brief at p. 8 represents that Document No. 2 was prepared on or about February 1, 1984) the court is satisfied that enough substantial need has been shown to require the production of these documents and that obtaining their substantial equivalent could not only not be obtained "without undue hardship" but could probably not be obtained at all.

Document No. 6, the supplemental statement of Head Nurse Williams, even though prepared after the appearance of the claimant's attorney, should be considered and treated as an addendum to her original statement and therefore should be discoverable.

As to Documents Nos. 7 and 8, statements of employees of the defendant that were obtained after the claimant's formal notice of an official claim on October 18, 1985, neither sufficient need nor hardship has been demonstrated to justify their disclosure. They were prepared, one nearly two years and the other more than two years after the events, and subsequent to the equivalent of instituting suit. Furthermore, they were obviously obtained at the behest of trial counsel and hence are more clearly a part of the attorney's work product. The claimant's need to [discover] them is far less substantial; and her ability to obtain the recollection and statements of these witnesses are otherwise available without invasion of trial counsel's files.

*Conclusion: The Court's Function Is to Balance*
*Conflicting Interests as Fairly and Justly as*
*Society's Conscience Might Require*

In the final analysis, the critical test in resolving the dispute at issue is the fair and just balancing of conflicting interests. What are the benefits to be achieved in refusing disclosure against the harm to the claimant that might thereby result. The records sought are not the pure peer review proceedings that public policy might justify in keeping secret. They are not the minutes of meetings during which self-criticism and fault-finding within the organization are encouraged. At issue basically are factual reports of several incidents that occurred while a patient of a hospital was undergoing treatment. Disclosing the contents of these reports for discovery purposes, since the hospital has nothing to hide, should not cause undue harm to the hospital. It should not, and will not, discourage nor frustrate their continuing and self-serving efforts to improve the delivery of health care. On the other hand, a woman whose leg had been amputated has allegedly sustained additional injury to the stump

of her severed limb while at the mercy of and under the control of the defendant hospital and its personnel.

The issue of the moment is *not* was the hospital negligent; that is reserved for a later day. The present question involves the search for the truth, for the factual, objective development of what took place. And the ultimate presentation of the evidence that these reports might provoke, it must be noted, is *not* to be submitted before a lay jury, at least not at this time. No lawsuit has yet been started. We are before a medical review panel, at the request of the defendant, composed of doctors and lawyers who unlike the usual trier of facts are commissioned to seek out those facts. One would assume that the panel would want access to *all* records and documents available. Certainly, the climate before a medical review panel is considerably different from the litigation pit of a trial.

As observed by the author of the annotation in 15 A.L.R. 3d 1446, "Scope of Defendant's Duty of Pretrial Discovery in Medical Malpractice Action":

> A majority of courts that have spoken on the question have allowed the plaintiff in a medical malpractice action quite liberal discovery, many specifically stating that the difficulty in discovering evidence in a malpractice action makes it all the more important that the plaintiff be allowed to examine the defendant, especially as to those facts that are solely within his knowledge.

When the input by one party to an issue in dispute has been so handicapped at the outset because of the conditions of health and the location and environment in which the incidents occurred and when measured against the relative investigative strengths of the parties, natural notions of fair play lean heavily toward opening rather than closing doors that might balance the contest. The potential harm to the claimant in refusing the discovery sought far outweighs the benefit to the defendant in maintaining their secrecy.

Considering all the factors herein discussed, therefore, it is the judgment of this court, serving as chairman of this panel, that the claimant's request as to the

production of Document Nos. 1-6 should be granted, but denied as to Document Nos. 7 and 8. To such extent the defendant's objections are overruled.